UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL T. COOK,

**DECISION AND ORDER**

                    Petitioner,                    **No. 02-CV-6073(VEB)**

        -vs-

EDWARD DONNELLY, Superintendent, Wende
Correctional Facility,

                    Respondent.
_____

## I.      Introduction

*Pro se* petitioner Michael T. Cook ("Cook" or "petitioner") seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 on the basis that his conviction following a jury trial on two counts

of second degree murder was unconstitutionally obtained. The parties have consented to

disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.      Factual Background and Procedural History

Charles Dalessandro and Rose Dalessandro, an elderly married couple who lived the City

of Rochester, were found dead in their home on the morning of June 3, 1995. Eighty-four-year-

old Charles had been beaten to death with a hammer as he lay in his bed. Eighty-one-year-old

Rose was beaten with the hammer and also stabbed with a pair of scissors; Rose died on the

kitchen floor. Cook was a former boyfriend of the Dalessandro's grand-daughter; the two of them

had lived at the victims' house for a period of time during the previous year. *See* T.371-72, 481,

490, 559-61, 585-89.[1]

_____

[1]          Citations to "T.__" refer to pages of the trial transcript.

Prior to the murder, at about 1 a.m., Cook and his acquaintance, Gerald Brown ("Brown") had smoked crack cocaine at Brown's house, and then had smoked more cocaine at Cook's house. T.363-67. At about 5 a.m., Brown and Cook went over to their friend, Eric Knight's house, where they smoked more cocaine. T.369-70.

Brown testified that Cook had been wearing shorts a striped t-shirt. T.376-77. Cook borrowed his (Brown's) black hooded sweatshirt and put it on while they were together. Knight apparently refused to let Cook borrow his hat. T.381. Brown testified that Cook left the house between 8 a.m. and 9 a.m. wearing shorts, the striped t-shirt, and a sweatshirt. He was not wearing a baseball hat, according to Brown. T.448-50.

Knight, the other friend, testified that Cook borrowed Brown's dark hooded sweatshirt, put it on, and left the house at about 9 a.m. T.464-67, 485. Knight stated that he did not allow Cook to borrow his hat, and did not recall Cook wearing a hat when he left the house at about 9 a.m. to get more money. T.464, 486.

Tyrone Stanley, who lived at 153 Winterroth Street, down the street from the Dalessandro's house, testified that at about 8 a.m., he saw a man clad in a black sweatshirt and black sweatpants walk down the street toward the direction of the Dalessandro's house. T.492-98. This man was also wearing a dark-colored baseball cap. T.508. Stanley identified Cook as the man who had passed his (Stanley's) house and crossed the street that morning. T.497.

When Cook returned to his friends, with more money for drugs, he told them that he had done something "big" and "bad" about which they would be hearing on the news. T.384, 468.

Cook apparently returned to the crime scene and "discovered" the victims; at about 11:30 a.m. on the morning of June 3, he informed Ed Youmans, who lived next door to the

Dalessandros, that he had had found the bodies of the victims. T.561-66. However, when Cook spoke with the police, he said that he had only seen the female victim in the kitchen before he ran out of the house. In contrast, when he spoke to the neighbor, Youmans, Cook specifically referred to the male victim, who had been killed in the bedroom. T.559-64, 921-22, 935-36. When Youmans asked Cook what he had done, Cook dropped his head and did not respond. T.566.

Although Cook initially denied any involvement in the slaying of Mr. and Mrs. Dalessandro, he remained under consideration as a suspect. Eventually, he gave a confession, to which several police officers testified. *See* T.709-819, 858-917, 920-30, 930-957. Cook stated that he had gone to the Dalessandro's home to borrow money to buy drugs and when Mrs. Dalessandro refused, he got angry and pushed her down. Her husband, Charles began "screaming" so Cook got a hammer from the basement and hit him in the head "a lot . . . until he stopped breathing." Cook then returned to the kitchen where he repeatedly struck Rose in the head with the hammer. He also stabbed her with some kitchen scissors until she stopped breathing. Cook proceeded to ransack the house to make it appear as if a burglary had occurred. Before leaving, he took some money from Mr. Dalessandro's wallet and went to buy more cocaine. T.737-39, 867-75, 535-47.

In additional to the witness testimony and petitioner's confessions, there was forensic evidence in the form of blood found on the sweatshirt worn by petition. Samples of this blood were consistent with that of the male victim and was of a composition found in only 0.6% of the human population. T.381, 466, 630-36, 840-47, 969-70. Also, a hair found on the female victim's hand was consistent with hairs from petitioner's head. T.669-79, 779-88. Human blood

was found on the scissors, which were also wet. (Petitioner claimed that he had washed off the hammer and scissors.). T.653, 873, 972.

There was no sign of forced entry into the Dalessandro's home. The victims' granddaughter, petitioner's ex-girlfriend, tried to speak with him by phone at the police station, and asked him how he could have done such a thing; petitioner said that he was "sorry." T.918-19. Cook also apologized to her in a letter. T.610-11.

The jury returned a verdict convicting Cook on two counts of intentional murder. He was sentenced to consecutive terms of 25 years to life for each conviction.

Cook's conviction was unanimously affirmed on direct appeal. *People v. Cook*, , *leave denied.* Cook collaterally attacked his conviction by means of an application for a writ of error *coram nobis*, which was summarily denied by the intermediate appellate court.

This habeas petition (Docket No. 1) followed in which Cook has raised the following grounds for relief: (1) "conviction obtained by use of evidence obtained pursuant to an unlawful arrest and detention" (Petition, ¶12A); (2) "conviction obtained by violation of the privilege against self-incrimination (Petition, ¶12B); (3) "conviction obtained by action of jury which was unconstitutionally selected and impaneled" (Petition, ¶12C); and (4) "sentence was unduly harsh and excessive" (Petition, ¶12D). Respondent answered the petition. *See* Docket No. 8.

For the reasons that follow, the request for a writ of habeas corpus is denied and the petition is dismissed.

### III.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir.2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams*, 529 U.S. at 413. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *See id.* at 408-10; *see also Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir.2003). "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV.    Analysis of the Petition

### A.    Ground One

In support of Ground One, Cook states that he was "held unlawfully by the Rochester police department in an interrogation room where the doors were locked and his freed of liberty was impeded. There was no probable cause to hold defendant and officer contends that defendant was merely a witness untill [sic] 11:30 p.m. that evening when a statement made by defendant was signed confessing to the homicides." Petition, ¶12A (Docket No. 1).  Cook appears to be alleging a violation of his Fourth Amendment rights, to the extent that he accuses the police of detaining him without probable cause.

As respondent points out, to the extent that Cook asserts a Fourth Amendment claim, it is precluded from habeas review under the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976), in which the Supreme Court curtailed federal habeas corpus review of Fourth Amendment claims arising out of state court convictions. *Stone v. Powell* held that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not

-6-

require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial. *Id.* at 482 (emphasis supplied); *see also Gates v. Henderson*, 568 F.2d 830, 836-37 (2d Cir.1977) (*en banc*), *cert. denied*, 434 U.S. 1038 (1978). New York provides a facially adequate statutory procedure for litigation Fourth Amendment claims; indeed, Cook took advantage of this process by means of a suppression hearing held before the trial court on September 6, 7, and 8, 1995. After hearing extensive testimony, the trial court denied the suppression motion. Cook chose not to pursue his Fourth Amendment issues on direct appeal but this does not alter the fact that he clearly took advantage of the opportunity to litigate his Fourth Amendment claims in state court. Thus, Cook cannot and does not contend that New York failed to provide a corrective procedure to redress his alleged fourth amendment claim. Indeed, as the Second Circuit has noted, "the 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* (McKinney 1984 & Supp.1988), as being facially adequate.'" *Capellan v. Riley*, 975 F.2d 67, 70 n.1 (2d Cir. 1992) (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989) and citing *Gates*, 568 F.2d at 837 & n. 4; *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)). "[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief. . . . [T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim[.]" *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002).

Thus, the only way that Cook can obtain federal review of his Fourth Amendment claims is by demonstrating an "unconscionable breakdown" in the otherwise adequate process which he was afforded under New York state law. *See Gates*, 568 F.2d at 840. This he cannot do. All Cook is asserting is that the state courts erroneously decided his motion to suppress, and he is requesting that this Court conduct a *de novo* factual review of his claims. The relief requested, however, is expressly forbidden by the *Stone v. Powell* doctrine, as the Second Circuit has explained many times: A petitioner's mere dissatisfaction or disagreement with the outcome of a suppression motion is not sufficient to establish that an "unconscionable breakdown" occurred in the existing process in violation of the petitioner's Fourth Amendment rights under the Constitution. *Capellan*, 975 F.2d at 71 ("[T]o the extent that [petitioner] claims that the Appellate Division erred in its ruling . . . , this would not give us authority to review his claims since a mere disagreement with the outcome of a state court ruling is *not the equivalent* of an unconscionable breakdown in the state's corrective process.") (emphasis supplied); *Gates v. Henderson*, 568 F.2d at 840 ("*Stone v. Powell* . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts.").

Clearly, then, a petitioner's mere disagreement with the outcome of the state courts' rulings "is not the equivalent of an unconscionable breakdown in the state's corrective process." *Capellan*, 975 F.2d at 72; *accord, e.g., Watkins v. Perez*, No. 05 Civ. 477(GEL), 2007 WL 1344163, *23 (S.D.N.Y. May 30, 2007) (holding that without more, rejection by state appellate court of petitioner's Fourth Amendment claims, is not an "conscionable breakdown" in the state's corrective process; noting that a "habeas court cannot grant relief simply because it may

disagree with the state court's resolution of the claim"); *Woods v. Kuhlmann*, 677 F. Supp. 1302, 1306 (S.D.N.Y. 1988) ("The doctrine of *Stone v. Powell*, however, forbids *de novo* review of state court fact-finding on a Fourth Amendment issue particularly where, as here, the petitioner can claim only that the issue was wrongly decided."); *Huntley v. Superintendent*, No. 9:00CV191, 2007 WL 319846, at *8 (N.D.N.Y. Jan. 30, 2007); *Gonzalez v. Superintendent, Sullivan Corr. Fac.*, 761 F. Supp. 973, *977 (E.D.N.Y. 1991) (rejecting habeas petitioner's claim that state court denied his request for a probable cause hearing insufficient facts asserted to warrant such a hearing was "unconscionable breakdown" in the process afforded by the state; petitioner was provided, as mandated by Stone, with a full and fair opportunity to litigate his fourth amendment claim in the state courts and "[t]he fact that petitioner was denied his request for such a hearing does not, in and of itself, affect the legitimacy of the state process").

Upon careful review, the Court cannot find evidence of an "unconscionable breakdown" of the Fourth Amendment process afforded him. Rather, Cook can claim only that, in his opinion, the Fourth Amendment issues were incorrectly decided by the state courts. The Second Circuit clearly has held that a petitioner's mere disagreement with the state courts' rulings on his Fourth Amendment issues does not suffice to demonstrate that some type of governmental obstruction amounting to an "unconscionable breakdown" in the state's corrective procedures prevented him from fully and fairly litigating his Fourth Amendment claims. *Capellan*, 975 F.2d at 72. Because Cook can show nothing more than that he disputes the correctness of the state court's rulings, the doctrine of *Stone v. Powell* forbids *de novo* review of any state court fact-finding on such issues.  For all of the foregoing reasons, federal habeas review of Cook's Fourth Amendment claim regarding his arrest is unavailable under the doctrine of *Stone v.*

*Powell*, and the claim is dismissed.

**B.      Ground Two**

In support of his second ground for relief, Cook contends that he was improperly detained at police headquarters without access to an attorney, in violation of his Sixth Amendment right to counsel. As respondent points out, this claim was not raised on direct appeal, but rather was asserted in the context of an ineffective assistance of appellate counsel in Cook's *coram nobis* application. However, a *coram nobis* petition is not an appropriate vehicle for asserting trial errors, and the claim has not been properly exhausted. *See Otero v. Stinson*, 51 F. Supp.2d 415, 419 (S.D.N.Y.1999) (holding that because the *coram nobis* remedy addresses appellate errors, not trial errors, ineffective assistance of trial counsel claims are not properly raised there and are not exhausted by such a motion); *Turner v. Artuz*, 262 F .3d 118, 123 (2d Cir. 2001) (stating that in *coram nobis* application, petitioner could raise only ineffective assistance of appellate counsel; the predicate claims appellate attorney supposedly should have argued were not fairly presented to state court). Pursuant to the authority vested in the district courts by 28 U.S.C. § 2254(b)(2), the Court will exercise its discretion to deny the petition on the merits.

"The Sixth Amendment to the United States Constitution provides that 'in all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel.'" *Claudio v. Scully*, 982 F.2d 798, 801 (2d Cir. 1992) (quoting U.S. Const. amend. VI). "The right to counsel protected by the Sixth Amendment 'is the right to the effective assistance of counsel.'" *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)). Cook contends that he had a constitutional right to counsel while he was questioned as a suspect in the Dalessandro murders because he, at the same time, had pending criminal charges on an unrelated matter. Cook makes

this assertion even though he never requested an attorney in the Dalessandro matter and was not represented by counsel on the unrelated, pending charges at the time of the interrogation in the Dalessandro murders. *See* People's Affirmation at 2, Respondent's Exhibit ("Resp't Ex.") L at 125.[2] Thus, Cook did not have the benefit of the New York state law rule that if an attorney has actually entered the picture with regard to unrelated, pending charges, must police questioning cease with regard to questioning on the charges at issue. *People v. Ruff*, 81 N.Y.2d 330, 333 (N.Y. 1993). Thus, as respondent argued, Cook did not show a violation of New York's right to counsel as a matter of New York law. As the Second Circuit has explained, "[t]he New York Court of Appeals has consistently interpreted the right to counsel under the New York Constitution more broadly than the Supreme Court has interpreted the federal right to counsel." *Claudio v. Scully*, 982 F.2d 798, 903 (2d Cir. 1992) (citing *People v. Settles*, 46 N.Y.2d 154, 161 (N.Y. 1978) ("So valued is the right to counsel in this State, it has developed independent of its Federal counterpart. Thus, we have extended the protections afforded by our State Constitution beyond those of the Federal–well before certain Federal rights were recognized.") (citations omitted)).[3]

It is beyond debate that on a petition for federal habeas relief, a district court is "limited to

---

[2]     Respondent's Exhibits are submitted in connection with the Answer to the Petition.

[3]     *See also People v. Bing*, 76 N.Y.2d 331, 339 (1990) ("There are two well-defined situations in which the right is said to attach indelibly under the State Constitution and a waiver, notwithstanding the client's right to waive generally, will not be recognized unless made in the presence of counsel. The first, similar to the federal right, deals with waivers after formal proceedings have commenced. The second, recognized only in New York, relates to uncharged individuals in custody who have retained or requested an attorney. Police authorities may not question them in the absence of counsel.") (citations omitted); *United States v. Broccolo*, 797 F. Supp. 1185, 1196 (S.D.N.Y. 1992) ( "Under the law of this Circuit, in contrast to what had been the law in the State of New York during most of the last decade, *see People v. Bing*, . . . , a suspect has no indelible Sixth Amendment right to counsel which requires the presence of counsel in order for a waiver of such right to be recognized." ), *aff'd mem.*, 999 F.2d 536 (2d Cir. 1993).

deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

*Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also* 28 U.S.C. § 2254(a). Cook has shown

neither a violation of his rights under New York state law, nor an error of federal constitutional

law. Accordingly, habeas relief is not available with regard to his second claim.

### C.    Ground Three

Cook asserts that his jury was unconstitutionally selected and impaneled because one

juror, Enoch Randall was improperly dismissed as unqualified to serve, and a second juror

George Stevenson was improperly retained on the jury, despite the fact that he had a passing

acquaintance with one of the victim's sisters. When the Appellate Division considered the claim

regarding Randall on direct appeal, it stated as follows:

> [The trial court] did not err in discharging a sworn juror over defendant's
> objection. The juror indicated that he did not want to continue serving as a juror
> for financial reasons. The court conducted a thorough and searching inquiring
> regarding whether the juror could nevertheless remain impartial. The court
> properly found that the juror was 'grossly unqualified' to continue serving as a
> juror because the juror stated numerous times that his mind was not on the case
> because of his financial difficulties, and he candidly admitted that he did not
> believe it would be fair to defendant if he were to remain as a juror.

*People v. Cook*, 275 A.D.2d 1020, 1021, 713 N.Y.S.2d 586, 586 (App. Div. 4th Dept. 2000)

(citations omitted). As to the second juror, the Appellate Division stated, "The [trial] court also

did not err in denying defendant's request to remove another sworn juror who knew the sister of

one of the victims. That juror indicated that he was a mere acquaintance of the woman and could

remain impartial." *Id.* (citations omitted). In rejecting Cook's claims about the trial court's

handling of the two juror issues, the Appellate Division not apply federal law in an incorrect

manner.

-12-

The Sixth Amendment of the United States Constitution guarantees individuals the right to a trial by an impartial jury and is made applicable to the states by the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968); *see also*, *e.g.*, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 586 (1976) (Brennan, J., concurring) ("It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression.")

A trial court's finding of juror impartiality may be overturned only for "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). Indeed, a trial court's conclusion that a juror was impartial is subject to a "presumption of correctness." *Id.* at 1037-38 (citing *Rushen v. Spain*, 464 U.S. 114, 120 (1983)); *see also Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 813 (2d Cir. 2000) ("On [28 U.S.C.] § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial."); *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir.1995), *cert. denied*, 515 U.S. 1136 (1995) (citation omitted). The Supreme Court has noted more than once that a that trial judge's determination regarding a juror's impartiality is a factual determination by the trial court. *E.g.*, *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (citation omitted). This "determination is essentially one of credibility, and therefore largely one of demeanor [,] . . . the trial court's resolution of such questions is entitled . . . to 'special deference.'" *Patton v. Yount*, 467 U.S. at 1038 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984)).

### 1. Improper discharge of juror Randall

Randall, the first juror, reported his concerns just shortly after the jury was impaneled and prior to opening statements. During the lunch recess, he discovered that his employer would not

pay him while he was serving on jury duty. T.321. Randall's job was through a temporary service, and he was acting as the sole provider for his family (he and his wife had one child and were expecting a second). T.297-99, 318. Randall informed the trial court and the attorneys at a bench conference that the did not think he could be fair, given that he had this matter on his mind. He stated that his mind "wouldn't be there" and "wouldn't be on the case" knowing he could not "take care of [his] family" and that would not "be fair on [defendant's] behalf." T.317-21. Upon further questioning by the trial court, Randall maintained this position, asserting, "My mind is made up." Juror Randall told the court that he was obligated to pay for wife's medical care and his daughter's school tuition. He kept repeating that his mind was "not there." T.325. When asked whether he could "concentrate on the facts and render a verdict based on the facts," Juror Randall replied, "My mind is not there so I don't think I would be able to . . . ." He elaborated, "If my mind is not here I wouldn't even want to be here." T.325-26. Over defense objection, the trial judge discharged Juror Randall as "grossly unqualified,"[4] stating that he could not allow Randall to sit on the jury "when he specifically, directly tells [the court] he is not going to keep his mind on it and . . . his mind is made up." T.326-27. In making his decision, the trial judge expressly noted that he was taking into consideration Juror Randall's "body language" and his demonstrated "insistence". *Id.*

Here the record amply supports the trial court's finding, and this Court has found nothing

---

[4] Under New York law, trial judge is authorized under New York Criminal Procedure Law ("C.P.L.") § 270.35 to dismiss jurors under the following circumstances: "If at any time after the trial jury has been sworn and before its rendition of a verdict the court is satisfied, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve . . . , or that a juror has engaged in misconduct of a substantial nature . . . , the court may, if an alternative juror . . . is available for service, discharge such trial juror and order that he be replaced." N.Y. CRIM. PROC. LAW § 270.35(1); *see also Smith v. Phillips*, 455 U.S. 209, 242 (1982) (noting that C.P.L. § 270.35 provides a remedy for eliminating the possibility of juror bias).

to indicate that the trial judge committed error in concluding that juror Randall was unqualified to remain on the jury. The trial court's findings of juror impartiality may "be overturned only for 'manifest error.'" *Mu'Min v. Virginia*, 500 U.S. 415, 428-29 (1991) (quoting *Patton v. Yount*, 467 U.S. at 1031 (quotation omitted). Cook has failed to set forth any evidence, let alone "clear and convincing" new evidence, to rebut the presumption of correctness afforded the trial court decision on this factual issue. Accordingly, this claim is without merit. *Accord*, *e.g.*, *Wright v. Smith*, No. 9:03-CV-806, 2007 WL 2412248, at *19 (N.D.N.Y. Aug. 21, 2007).

### 2. Failure to discharge juror Stevenson

The issue regarding the second juror arose on the morning of the second day of testimony. Mary Berrittella, a sister of one of the victims, had been attending the trial. Berrittella ran into one of the jurors, George Stevenson, on the way into court that morning and they recognized each other. Berrittella's husband and Stevenson's brother-in-law had formerly been business partners. According to Berrittella, she and Stevenson had not seen one another for "maybe 10, 15, 20 years." Berrittella noted that her husband had been dead for 14 years, and that she did not even recognize juror Stevenson at first. T.406-09. Berrittella also stated that she and Stevenson were never really acquainted; having only seen each other a few times. Also, Stevenson was not acquainted with the victims. T.410-12. Steven informed the court that he did not know Berrittella's last name and while he thought that he might have seen her about a "year, year and a half ago," he was not sure what the occasion would have been. T.413-14. Stevenson stated that their distant acquaintance would not affect his ability to fairly and impartially decide the case, and that it would not cause him any difficulty. He did not even bother mentioning it at first because "it didn't alter one way or another what [his] decision would be." T.415-16. Juror

Stevenson also confirmed that he did not know the actual victims, the Dalessandros, at all. T.416. Finally, Stevenson affirmed that he had not discussed the matter with any of the other jurors. T.417.

As the Second Circuit has noted, "it has never been supposed that mere acquaintance with those involved in a criminal case was by itself a disqualification for jury duty." *United States ex rel. Brown v. Smith*, 306 F.3d 596, 604 (2d Cir. 1962) (holding that fact that some jurors had casual dealings with either decedent, or defendant who was charged with arson causing death, was not, by itself, sufficient to establish prejudice). *See also United States v. Calabrase*, 942 F.2d 218, 224-25 (3d Cir.1991) ("A juror who merely had a passing acquaintance with one of the defendants would not, on the basis of acquaintance alone, be rendered incompetent to serve in this case . . . .") (listing cases of non-bias based on juror relationships with the defendant's family, the defendant, the victim, or other participants in the proceedings, such as a prosecutor, investigator, or social worker); *United States v. Ferri*, 778 F.2d 985, 991-94 (3d Cir.1985) (acquaintance between the husband of a juror and one of the government's witnesses did not implicate implied bias) (cited in *United States v. Vitale*, 459 F.3d 190, 198 (2d Cir. 2006)).

*Rushen v. Spain*, 464 U.S. 114, 117 (1983), is instructive. There, during course of 17-month long trial of six inmates involved in the infamous 1971 San Quentin prison escape, evidence was introduced of a crime, unrelated to those at issue in respondent's trial, of which one juror had some knowledge. In particular, a defense witness identified a Black Panther named Pratt as a police informant involved in an alleged plot to organize the riot. The prosecution sought to impeach this witness by introducing evidence that Pratt was in custody for the 1968 murder of a Santa Monica woman during the entire period at issue. This testimony triggered the

juror's recollection of the murder of a childhood friend, who was the woman Pratt had been convicted of killing. The juror then went to the judge *ex parte* on two occasions and told him of her personal acquaintance with Pratt's 1968 murder victim, expressing fear that she might cry if the 1968 murder were explored further at trial. The judge asked her on each occasion whether her disposition of the case would be affected by this matter, and the juror assured him that it would not. The judge told her not to be concerned and that the matter probably would not be mentioned again. The judge made no record of either conversation, and he did not inform the defendants or their counsel about them. 464 U.S. at 116.

The jury convicted Spain, and his counsel subsequently learned of the *ex parte* communications between judge and juror and moved for a new trial. At a hearing on the motion, the juror testified that she had not remembered her friend's death during *voir dire* and that her subsequent recollection of it during trial did not affect her ability impartially to judge respondent's innocence or guilt. The juror admitted telling other jurors that she personally knew the defense witness' 1968 murder victim, but denied making any disparaging remarks about the Black Panther Party. The trial judge concluded that the *ex parte* communications "lacked any significance" and that the defendant Spain suffered no prejudice therefrom. Accordingly, he denied the motion for new trial. 464 U.S. at 116-17. On habeas review, the district court held that automatic reversal was necessary because the absence of a contemporaneous record made intelligent application of the harmless error standard impossible. Alternatively, it concluded that a post-trial hearing could not establish that the constitutional error was harmless beyond a reasonable doubt. The Ninth Circuit affirmed.

The Supreme Court "emphatically disagree[d]," *Rushen*, 464 U.S. at 118, noting that it

has previously held that "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* (citing *Smith v. Phillips,* 455 U.S. at 217) (declining to find inherent bias where, during the defendant's state court trial, one of the jurors applied to the prosecutor's office for a job as an investigator; the application was not brought to the parties' attention until sometime after the verdict was rendered, at which time the state court held a post-trial hearing and, relying on the juror's own testimony, found "beyond a reasonable doubt" that the juror's action had not influenced the verdict. The Supreme Court concluded that, in the circumstances of that case, it would not be proper to impute bias in the verdict or to find a post-trial hearing inadequate as a remedy for the alleged due process violation; it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.") (citing *Remmer v. United States*, 347 U.S. 227, 229-30 (1954) (instructing the trial judge to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate.")).

Here, the trial judge engaged in a "probing and tactful inquiry" on the record and "carefully consider[ed] the juror's answers and demeanor to ascertain whether [his] state of mind will affect [his] deliberations." *People v. Buford*, 69 N.Y.2d at 299; *accord Booker v. Girdich*, 262 F. Supp.2d 264, 268 (S.D.N.Y. 2003). The record amply supports the trial court's finding, and this Court has found no indication that the trial judge committed "manifest error," *Patton v. Yount*, 467 U.S. at 1031, in concluding that Stevenson was qualified to remain on the jury. Certainly, Cook has not come forward with clear an convincing evidence to disarm such findings. Given the foregoing Supreme Court precedent, *e.g.*, *Smith v. Phillips* and *Rushen v. Spain*, the

state courts finding that Stevenson was qualified to continue to serve on Cook's jury was clearly not an unreasonable application of federal law, let alone an incorrect one.

### D.    Ground Four

As noted above, Cook received two consecutive 25 years-to-life sentences, making his aggregate sentence 50 years to life. For his fourth ground for relief, Cook contends as follows:

> Defendant was initially charged with murder committed during a robbery. Robbery being the initial crime. Prosecution dropped robbery charge leaving charges of murder. The crimes of murder arise from the same transactions, commission of the former is a material [element] of the latter, and therefore the sentence[s] must run concurrently.

Petition, ¶12D (Docket No. 1).  Basically, he is contending that the murders were part of a single act of violence, and imposition of consecutive sentences was inappropriate because there were not two separate and distinct acts involved. Cook's appellate counsel did not make this precise argument on direct appeal; rather, he made a request for leniency based on Cook's troubled childhood and drug use.

Cook's claim that he should have been sentenced concurrently is not cognizable on federal habeas review because "it is purely a matter of state law how a prison term should be served, whether concurrent or consecutive." *Lopez v. Goord*, No. 05 Civ. 5855(AKH), 2008 WL 3158447, at *4 (S.D.N.Y. Aug. 5, 2008) (noting that petitioner's consecutive aggregate sentences totaling 65 years to life not disproportionate where petitioner killed a three-year-old girl in an attempt to shoot at her father and injured another bystander in a drive-by shooting; moreover, sentences did not constitute an Eighth Amendment violation) (citing  *Davis v. Herbert*, No. 02-CV-04908, 2003 WL 23185747, at *15 (E.D.N.Y. Oct. 24, 2003)).  In any event, his claim the killings were not really separate offenses is without merit under New York law.

I note, as an initial matter, that Cook's allegations about the felony murder charges being dropped is immaterial to the analysis of whether consecutive sentencing was appropriate. Even it that were not the case, the result he urges is not required under New York law. *See People v. Brathwaite*, 63 N.Y.2d at 843 (Although defendant's two felony-murder convictions arose from a single transaction, which was an armed robbery, it was the separate acts of shooting each victim which constituted the offenses and neither act was a material element of the other; therefore, statute providing that sentences must run concurrently when more than one sentence of imprisonment is imposed for two or more offenses committed through a single act or omission did not require that sentences for each felony-murder run concurrently.)

New York's Penal Law provides that sentences must run concurrently when two or more offenses are committed through a single act or through an act which itself constituted one of the offenses and also was a material element of the other. *See* N.Y. PENAL LAW § 70.25(2). However, trial courts in New York "retain consecutive sentence discretion when separate offenses are committed through separate acts, though they are part of a single transaction." *People v. Brown*, 80 N.Y.2d 361, 364 (N.Y. 1992) (citations omitted). An "act" is defined under New York's Penal Law as a "bodily movement." N.Y. PENAL LAW § 15.00(1); *accord People v. Brown*, 80 N.Y.2d at 364.

By way of illustration, if a shooter injures two victims with a single bullet, the two offenses are considered to be "committed through a single act." N.Y. PENAL LAW § 70.25(2); *see, e.g.*, *People v. McFadden*, 180 A.D.2d 825, 826-27, 580 N.Y.S.2d 406, 407 (App Div. 2d Dept.) (upholding imposition of concurrent, rather than consecutive, where single bullet caused injuries to two victims), *appeal denied*, 79 N.Y.2d 1004, 584 N.Y.S.2d 458, 594 N.E.2d 952 (N.Y.

1992); *People v. Luster*, 148 A.D.2d 305, 306, 538 N.Y.S.2d 273, 274 (App. Div. 1ˢᵗ Dept.) (same), *appeal denied*, 74 N.Y.2d 666, 543 N.Y.S.2d 409, 541 N.E.2d 438 (N.Y. 1989). If, however, the two victims were hit by separate bullets, consecutive sentences are appropriate under New York law, even if the shooter's intent was to hit only one of the victims. *See People v. Brathwaite*, 63 N.Y.2d at 843 (consecutive sentences upheld; "although the two deaths may be said to have occurred in the course of a single extended transaction–the robbery–it was separate 'acts' which caused the deaths of the owner and the clerk (i.e., there is no contention that it was the firing of the same shot that killed both the owner and the clerk), and neither was a material element of the other" ).

Here, according to Cook's own version of events, after Mrs. Dalessandro refused to lend him $20, he went to the cellar and got a hammer. He returned upstairs to the bedroom where Mr. Dalessandro was lying in bed and struck him on the head until he stopped breathing. This was one criminal act. Then, Cook went to the kitchen and proceeded to bludgeon Mrs. Dalessandro over the head with the same hammer, after which he stabbed her in the throat and chest with a pair of scissors he found on the counter–the second criminal act. As in *People v. Brathwaite*, although the two deaths may be said to have occurred in the course of a single extended transaction–Cook's attempted robbery of the Dalessandros–there were separate "acts" which caused the deaths of Mr. and Mrs. Dalessandro. Neither act of killing was a material element of the other act of killing. Accordingly, consecutive sentencing was an appropriate exercise of discretion by the trial judge. Cook's fourth ground does not warrant habeas relief.

## V.     Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus filed by petitioner

Michael T. Cook is denied. Because Cook has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no Certificate of Appealability shall issue with respect to any of petitioner's claims.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: March 31, 2009
       Rochester, New York.